UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ESTHER SANDOVAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-218 |
| | ) | |
| FRANCISCAN ALLIANCE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the court on the Motion for Summary Judgment [DE 25] filed by the defendant, Franciscan Alliance, Inc., on September 28, 2023. For the following reasons, the Motion for Summary Judgment is **GRANTED.**

*Background*

The plaintiff, Esther Sandoval, initiated this lawsuit on August 1, 2022, against the defendant, Franciscan Alliance, Inc., her former employer, alleging that Franciscan violated both federal and Indiana state law when it terminated her employment as an insurance biller on July 1, 2021. Sandoval alleges that Franciscan terminated her based on her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and her race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Sandoval brought Indiana state-law claims for intentional and negligent infliction of emotional distress as well.

On September 28, 2023, Franciscan filed the instant motion for summary judgment. [DE 24]. Sandoval responded in opposition on December 15, 2023. [DE 32]. On January 15, 2024, Franciscan filed its reply. [DE 38].

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment. As a result, this court has jurisdiction to decide this case pursuant to **28 U.S.C. § 636(c)**.

### *Undisputed Material Facts*

Prior to her termination in 2021, Sandoval had been employed by Franciscan since 1978 and served various roles during her employment. [DE 32 at 1, ¶ 1]. At the time of her termination, Sandoval was working as an insurance biller, correcting and processing billing claims assigned to her. [DE 32 at 1, ¶ 2]. Each insurance biller received assignments according to an alphabetical split, such that each claim was assigned to a particular biller based on the last name of the patient whose claim was at issue. [DE 32 at 3, ¶ 11]. Sandoval was responsible for split A through G, while co-worker Robin Jusko was responsible for split H through L, and Julie Kolanowski was responsible for split M through Z. *Id.*

As an insurance biller, Sandoval was expected to meet an established key performance indicator ("KPI") of handling at least 180 accounts per day. [DE 32 at 4, ¶ 12]. To count toward an insurance biller's KPI, an account had to be corrected, noted, and billed, meaning that the insurance biller needed to review the account's error code and make a correction, add a note to the account related to the review or steps taken to resolve the account, and correct the account so that it got billed to the payer on file. [DE 32 at 4, ¶ 13] To meet a KPI of 180, an insurance biller would have to, on average, correct, note, and bill 180 claims per day, so that on average at the end of the month, the insurance biller's daily average KPI would equal 180 claims per day. [DE 32 at 4, ¶ 14].

Between October 2020 through June 2021, Sandoval continually failed to meet the expected KPI of 180, except for February 2021. [DE 32 at 5, ¶¶ 15, 17]. According to Sandoval,

she struggled to meet the KPI for various reasons including the difficulties of learning to work from home because of the COVID-19 pandemic, an increased workload due to coworkers leaving the billing department, being not allowed to work overtime, and being pulled for retraining. [DE 32 at 6, ¶ 19]. In March 2020, during the pandemic, Franciscan allowed insurance billers, such as Sandoval, the opportunity to work remotely, but insurance billers still were expected to meet the standard KPI of 180. [DE 32 at 9, ¶ 23]. Employees who failed to meet the required KPI were provided a coaching session, and if there was no improvement, the employee was instructed to return to working in the office. [DE 32 at 9, ¶ 24].

In March 2020, Sandoval's KPI was 119, below the 180 standards. [DE 32 at 9, ¶ 25]. Franciscan assigned Sandoval to a re-training period in April 2020, where she reviewed claims with supervisors between 2:00 p.m. and 3:30 p.m. each day for five days. [DE 32 at 10, ¶ 26]. On April 23, 2020, Sandoval's supervisors held another training call with her. [DE 32 at 10, ¶ 27]. After retraining Sandoval, Franciscan provided her with additional time to increase her productivity to meet the expected KPI of 180. [DE 32 at 10, ¶ 28]. Sandoval's KPI was 43 for April 2020 and 68 for May 2020. [DE 32 at 11, ¶¶ 30, 31]. On June 5, 2020, Franciscan issued Sandoval a first Corrective Action for unsatisfactory work performance for May 2020. [DE 32 at 11, ¶ 32]. On July 6, 2020, Sandoval was issued a second Corrective Action for unsatisfactory work performance during June 2020, for her KPI of 106. [DE 32 at 12, ¶ 35].

In May 2020, Sandoval emailed her supervisors to argue that the workload was not fair and explained that she was falling behind because older accounts, as well as neurotransmitter accounts, took longer to process. [DE 32 at 26, ¶ 81]. However, Franciscan's protocol was for all insurance billers to work the older accounts in the insurance biller's assigned work queue first. [DE 39 at 33, ¶ 81]. According to Franciscan, older accounts were not necessarily more complex

or more time-consuming than newer accounts and such protocol was necessary because there were specific timeframes within which claims must be submitted to be timely and eligible for payment. *Id.*

On July 31, 2020, Franciscan management met with Sandoval and discussed how she should focus her time when working accounts, recommended that Sandoval document responses to questions asked because she tended to ask the same questions, as well as other recommendations to improve her efficiency to meet the KPI of 180. [DE 32 at 12, ¶ 37]. Nevertheless, Sandoval received a KPI of 125 during July 2020 and was issued a third Corrective Action for unsatisfactory work performance in September 2020. [DE 31 at 13, ¶ 40]. After Sandoval's third Corrective Action, she was placed on a performance improvement plan due to her low KPI. [DE 32 at 14, ¶ 42].

In April 2021, Sandoval was issued a fourth Corrective Action for unsatisfactory work performance for a KPI of 159 in January 2021 and a KPI of 162 in March 2021. [DE 32 at 15, ¶ 45]. Following her fourth Corrective Action, Sandoval again failed to meet the expected KPI of 180 in April (155), May (162), and June (157) of 2021. [DE 32 at 15, ¶ 46]. Franciscan's corrective action process for a billing department employee who does not meet the expected KPI is as follows:

1. The 1st month an employee does not meet their KPI standards; the employee will receive a verbal warning.
2. On the 2nd month (not necessarily consecutively) of not meeting the KPI the employee will receive a 1st written warning.
3. On the 3rd month of not meeting KPI standards the employee will receive a 2nd written warning and will be placed on a 30-day probationary plan with an action plan.
4. At the end of the 30-day probationary period if the KPI standard is not met the final step will be termination of employment.

> 5. If staff is working a special project outside the normal daily duties management will take those hours into consideration when calculating the KPI results.
> 6. The results will be based on a 12 month rolling period starting with the 1st occurrence.

[DE 32 at 15-16, ¶ 48].

On July 1, 2021, Franciscan terminated Sandoval for her continued failure to meet the expected KPI. [DE 32 at 16, ¶ 50]. Sandoval, who is Hispanic, was 63 years old at the time of her termination. [DE 32 at 16, ¶ 51]. Four other employees in the collections department were terminated between 2019 and 2022 for failing to meet the expected KPI. [DE 32 at 17, ¶ 54]. The terminated employees were all younger than Sandoval, and their demographic included two African Americans, one Hispanic, and one Caucasian. *Id.*

Around 10-12 years before her termination, Sandoval reported that she felt discriminated against when Sherry Kozlowski, Sandoval's former supervisor, showed her a video depicting Sandoval as an elf singing "Feliz Navidad." [DE 32 at 22, ¶ 69]. Sandoval reported the video to human resources, who instructed the employee who created the video to remove it from his computer and not to show it to anyone. [DE 32 at 22, ¶ 72]. Sandoval was not the only Franciscan employee appearing in the video as an elf. [DE 39 at 29, ¶ 71].

### *Discussion*

Under **Federal Rule of Civil Procedure 56(a)**, summary judgment is proper only if the movant has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); ***Gnutek v. Illinois Gaming Board***, 80 F.4th 820, 824 (7th Cir. 2023); ***Garofalo v. Vill. of Hazel Crest***, 754 F.3d 428, 430 (7th Cir. 2014); ***Kidwell v. Eisenhauer***, 679 F.3d 957, 964 (7th Cir. 2012). A fact is material if it is outcome determinative under applicable law. The burden is upon

the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021).

When the movant has met its burden, the opposing party cannot rely solely on the allegations in the pleadings but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in [her] favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011); *see also* *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.")). The non-moving party cannot rely on conclusory allegations. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). Failure to prove an essential element of the alleged activity will render other facts immaterial. *Celotex*, 477 U.S. at 323; *Filippo v. Lee Publications, Inc.*, 485 F. Supp. 2d 969, 972 (N.D. Ind. 2007) (the non-moving party "must do more than raise some metaphysical doubt as to the material facts; she must come forward with specific facts showing a genuine issue for trial").

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). The trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial. *Anderson*, 477 U.S. at

248; ***Cung Hnin v. Toa, LLC***, 751 F.3d 499, 504 (7th Cir. 2014); ***Wheeler v. Lawson***, 539 F.3d 629, 634 (7th Cir. 2008).

Sandoval has alleged claims for age discrimination under the ADEA and racial discrimination under Title VII. Sandoval contends that Franciscan intentionally discriminated against her because of her age by reducing her role and influence in her final years of employment, making derogatory statements about her age and memory, and targeting her with age-motivated ridicule. Additionally, Sandoval claims that Franciscan discriminated against her due to her race by treating her differently than her Caucasian co-workers and ultimately terminated her employment because of her race in violation of Title VII. Finally, Sandoval asserted additional claims for Intentional and Negligent Infliction of Emotional Distress based on Franciscan's conduct.

A.  **Sandoval's Claims Under The ADEA**

"[T]he ADEA makes it unlawful for an employer 'to fail or refuse to hire ... any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" ***Chatman v. Bd. of Educ. of City of Chicago***, 5 F.4th 738, 746 (7th Cir. 2021) (quoting **29 U.S.C. § 623**). "The ADEA protects workers who are forty years old and older from discrimination based on age." ***Brooks v. Avancez***, 39 F.4th 424, 433 (7th Cir. 2022). Liability in a disparate treatment case "depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." ***Hazen Paper Co. v. Biggins***, 507 U.S. 604, 610 (1993) (emphasis added). Thus, to prevail on a disparate treatment claim under the ADEA, a plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." ***Gross v. FBL Fin. Servs., Inc.***, 557 U.S. 167, 180 (2009).

7

According to the Seventh Circuit, the proper way to assess a disparate treatment claim at the summary judgment stage is to ask whether the admissible evidence, considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a viable method to assist a plaintiff in convincing a court that the evidence permits such a conclusion. *Chatman*, 5 F.4th at 746.

To establish a prima facie case under the *McDonnell Douglas* framework, a plaintiff must establish that: (1) she is a member of a protected class; (2) she performed her job in accordance with her employer's legitimate expectations; (3) she was subject to an adverse employment action despite her reasonable performance; and (4) similarly situated employees, who were not members of her protected class, were treated more favorably. *Brooks*, 39 F.4th at 434. Then, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its actions. *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017). If the employer provides such an explanation, the burden shifts back to the plaintiff to submit evidence that the explanation is pretextual. *Id.* Pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020) (cleaned up). No matter if the plaintiff chooses to proceed under the *McDonnell Douglas* method of proof, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age." *Id.*

Turning to the first prong of the *McDonnel Douglas* framework, Sandoval was in her 60's during the relevant time period and is therefore covered by the ADEA. Next, "[b]ecause the prima facie and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, [the court] can proceed directly to the pretext inquiry." *Brooks*, 39 F.4th at 435. Here, the question of pretext and employer expectations overlap. Sandoval was not meeting Franciscan's KPI expectation of 180 as shown by her monthly reviews. Between April 2020 and July 31, 2021, Sandoval only met her KPI expectation once, in February 2021. [DE 39 at 6, ¶ 17]. During that period Franciscan gave Sandoval four Corrective Actions (written warnings) for failing to meet her expected KPI, instructed her to undergo retraining, and scored her a 1.8 out of 3 in the Job Specific Competencies category. (Sandoval Dep., p. 119, l. 25-p. 121, 1.14; p. 122, l. 16-p. 123, 1.2) (McKinnon Boykin Aff. ¶ 11). Thus, Franciscan had a legitimate nondiscriminatory reason for Sandoval's termination, as her repeated failure to meet the KPI expectation warranted corrective action, up to and including termination, under Franciscan's policy. [DE 32 at 15-16, ¶ 48].

That said, the question is whether Franciscan's rationale to terminate Sandoval was pretextual. Sandoval first points to Nancy Geisen as a comparator who Sandoval believes was similarly situated and treated more favorably that she was. "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007).

According to Sandoval, Geisen, a fellow insurance biller, failed to meet her KPI for nearly five months and never was disciplined. [DE 31 at 4]. True, the record shows that Giesen

did not meet the KPI threshold of 180 from May 2019 through September 2019. (Suppl. McKinnon-Boykin Aff., ¶ 8). Yet Franciscan did not enforce the KPI threshold between May 2019 through September 2019 against any insurance biller because there was a management transition in the department, which explained why Giesen was not disciplined. *Id.* Sandoval, who failed to meet the expected KPI during that time, was not disciplined either. *Id.* Additionally, Giesen transferred to another department in October 2019 and thus was not present during a significant period in which Franciscan enforced the KPI requirement. (Suppl. McKinnon-Boykin Aff., ¶ 7). Importantly, when Giesen did return to the billing department in August 2021, she met and exceeded the KPI threshold every month except her first month back when she received a KPI of 176. *Id.* These differentiating or mitigating circumstances distinguish the two job performances and Franciscan's treatment of them. Giesen therefore does not serve as a similarly situated comparator.

Likewise, Sandoval claims that Robin Jusko (age 58) and Julie Kolanowski (age 54), her coworkers in the billing department, did not meet their KPI for several months and never were disciplined. The evidence, however, does not support Sandoval's contention. Jusko and Kolanowski did fail to meet their KPI threshold in April 2020 when they received a KPI of 148 and 168 respectively. (Supp. McKinnon-Boykin Aff. ¶ 23). According to Franciscan's policy Jusko and Kolanowski could have faced a verbal warning for failing to meet their KPI threshold for one violation. By contrast, in April 2020 Sandoval had failed to meet her KPI for the fourth month in a row and could have been terminated under Franciscan's policy. *Id.* Instead, Franciscan allowed Sandoval the next several months to try and meet her KPI to no avail. In 2021, Sandoval failed to meet her KPI threshold in six out of the first seven months. (McKinnon-

Boykin Aff. ¶ 10). Jusko and Kalanowski regularly met or exceeded the KPI threshold during that time and were not subject to any disciplinary action. (McKinnon-Boykin Aff. ¶¶ 14, 15).

Lastly, Sandoval identifies Sefania Cipolla as a comparator. According to Sandoval, Cipolla, a younger Caucasian woman, was treated more favorably when Franciscan transferred her to an easier job in the Health Information Department after she failed to meet her KPI expectation in August 2019. [DE 31 at 4]. Sandoval contends that Franciscan allowed Cipolla to transfer departments to rectify her KPI deficiencies and withheld that opportunity from her. Context is important here. Cipolla specifically requested to transfer to another division; while Sandoval never asked about or requested to transfer divisions during any time she struggled to meet her KPI. If Sandoval had made the same or similar request and Franciscan arbitrarily granted Capolla's instead, then her argument may have some merit. As is stands, no evidence supports Sandoval's assertion that Franciscan treated Capolla more favorably by granting her transfer request. *See* **Robinson v. Honeywell, Micro Switch Div.**, 53 Fed. Appx. 379, 381 (7th Cir. 2002) (in which the plaintiff's own subjective belief could not show pretext that racial animus motivated the defendant's actions).

Furthermore, Sandoval's termination was not in isolation, as she was not the only employee terminated for failing to meet the KPI threshold. In fact, four other employees in the collections department were terminated between 2019 and 2022 for failing to meet the KPI expectation. (McKinnon-Boykin Aff. ¶ 14). Notably, all the terminated employees were younger than Sandoval. *Id.*

Overall, Sandoval has failed to establish that Franciscan's nondiscriminatory reason for her termination was in fact pretextual. Nor is there substantial evidence for a reasonable juror to

11

conclude that Franciscan terminated Sandoval because of her age. Thus, Franciscan is entitled to summary judgment as to Sandoval's ADEA claim.

### B. Sandoval's Claims Under Title VII

Title VII prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." **42 U.S.C. § 2000e-2(a)(1).** In ***Ortiz v. Werner Enterprises, Inc.***, 834 F.3d 760, 764, 766 (7th Cir. 2016), the Seventh Circuit abandoned the dichotomy of direct and indirect evidence on summary judgment in employment discrimination cases and held that the "sole question that matters" is whether a reasonable juror could conclude that the plaintiff would not have suffered the adverse employment action if she was a different sex or race and everything else had remained the same. All evidence should be considered together to understand the pattern it reveals. ***Ortiz,*** 834 F.3d at 765. Again, the Seventh Circuit's decision did not undermine the burden-shifting framework of ***McDonnell Douglas Corp. v. Green,*** 411 U.S. 792 (1973), or any other burden-shifting framework. ***Ortiz,*** 834 F.3d at 766.

As done in the ADEA analysis, the court will utilize the ***McDonnell-Douglas*** burden-shifting framework, as well as the evidence as a whole, to evaluate Sandoval's claim under Title VII. To begin, there is no dispute that Sandoval is Hispanic and is a member of a protected class or that she suffered an adverse employment action. Fatal to her claim, however, Sandoval has again identified no similarly situated co-workers who were treated more favorably because of their race. As discussed in the analysis in the previous section, Sandoval failed to rebut Franciscan's nondiscriminatory reason for her termination — that Franciscan terminated her because of her repeated failure to meet the KPI expectations. Sandoval has not pointed to any co-

worker of a different race who continually failed to meet the expected KPI and was treated more favorably.

      Sandoval claims that some Caucasian co-workers could work overtime in order to meet their KPI, while she was not, is evidence of discrimination. This argument lacks merit. The evidence shows that the billing department's standard practice was to allow insurance billers to work overtime if they were meeting their expected KPI. (McKinnon-Boykin Dep., p. 143, 1. 22 – p. 144, 1. 3). Sandoval could not work overtime because she routinely failed to meet the KPI expectation. According to Sandoval, one reason she struggled to meet the KPI was because she had to work on neurostimulator accounts which took longer to process. [DE 32 at 3, ¶ 9]. However, there were approximately 3-4 neurostimulator accounts processed by Sandoval each month, and each account typically took less than five minutes to complete. [DE 39 at 2]. Thus, it is unclear how working neurostimulator accounts significantly affected Sandoval's ability to meet the expected KPI. In fact, Jusko and Kolanowksi began working neurostimulator accounts as well in October 2020 and consistently met the expected KPI. (McKinnon-Boykin Aff., ¶ 15). Sandoval's co-workers were allowed to work overtime because they met the KPI expectation, in accordance with Franciscan's facially neutral policy. Again, Sandoval has failed to show how employees meeting the KPI threshold were similarly situated to her. Thus, Sandoval does not identify any viable comparator. As a result, she cannot survive summary judgment through application of the ***McDonnell Douglas*** factors.

      Similarly, Sandoval claims that another employee, Myra Hogan (who is African American), had worked accounts after clocking out to meet her KPI, against Franciscan policy, and never was disciplined. [DE 31 at 7]. Yet the facts do not support an inference that Hogan was allowed to work off the clock to meet her KPI while Sandoval was not because of her race.

Sandoval did not raise this issue until her exit interview after her termination. [DE 31 at 7]. Regardless, Franciscan investigated the allegation and found it to be unsubstantiated. (Townsend Aff. ¶ 8). Franciscan still held a coaching session with Hogan to discuss the issue and informed her that she could not work after clocking out. *Id.* At any rate, no evidence suggests that Hogan also failed to meet the KPI or that Franciscan permitted Hogan to work off the clock to meet that goal.

The only other evidence of racial discrimination offered by Sandoval is that she suffered "racial slurs and joking" resulting from a video Sherry Kozlowski, a former supervisor, showed her around 10-12 years ago. [DE 31 at 5]. The video portrayed Sandoval as an elf singing "Feliz Navidad" which Sandoval felt was discriminatory. [DE 32 at 22, ¶ 69]. Sandoval reported to Kozlowski that she was offended, after which Kozlowski asked the coworker who created the video to remove it from his computer and not to show it to anyone again. [DE 38 at 13]. Yet this isolated incident fails to establish that Franciscan had any racial animus against Sandoval. *See* **Overly v. KeyBank Nat. Ass'n**, 662 F.3d 856, 865 (7th Cir. 2011) (quoting **Merillat v. Metal Spinners, Inc.**, 470 F.3d 685, 694 (7th Cir. 2006) ("isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus"). Moreover, the alleged video incident took place 10-12 years before Sandoval faced any adverse employment action. Sandoval points to no other evidence of racial discrimination contemporaneous with her termination.

In summary, there is insufficient evidence to support a finding of discriminatory intent behind Franciscan's actions. As a result, Franciscan is entitled to summary judgment on Sandoval's claim under Title VII.

### C. Sandoval's State Claims For Negligent/Intentional Infliction Of Emotional Distress

Under Indiana law, a viable claim for negligent or intentional infliction of emotional distress requires that the plaintiff prove (1) the defendant engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. ***Rosa v. Valparaiso Cmty. Sch. Of Valparaiso, Ind.***, 2006 WL 487880, at *7 (N.D. Ind. Feb. 27, 2006). Conduct is found to be extreme and outrageous when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." ***Imoff v. Kmart Stores of Indiana, Inc.***, 149 F. Supp. 2d 559, 572 (N.D. Ind. 2021). Not only must a plaintiff show that the defendant engaged in extreme and outrageous conduct when alleging IIED under Indiana law, but she also must show that the defendant's alleged conduct "caus[ed] mental distress of a very serious kind." ***Ledbetter v. Ross***, 725 N.E.2d 120, 124 (Ind. App. Ct. 2000).

Sandoval alleges that she was "extremely physically upset" by Franciscan's acts and suffered emotional distress as a result. [DE 31 at 7]. Sandoval's declaration alone falls well short of establishing extreme and outrageous conduct. *See* ***King v. Wiseway Super Ctr., Inc.***, 954 F. Supp. 1289 (N.D. Ind. 1997) (dismissing a claim for intentional infliction of emotional distress when the plaintiff's supervisor constantly sabotaged her efforts to perform her job by scheduling her improperly, not allowing her to perform her job duties, not treating her as a manager, not giving her the information she needed, never communicating with her, never training her, forcing her to work without breaks, and making derogatory comments to others about her and her abilities).

Nor did Sandoval provide any analysis as to how Franciscan's conduct constituted negligent infliction of emotional distress. To maintain a cause of action for negligent infliction of

emotional distress under Indiana law, a plaintiff must satisfy the "impact rule." *Alexander v. Scheid*, 726 N.E.2d 272, 283 (Ind. 2000). The impact rule originally consisted of three elements: (1) an impact on the plaintiff; (2) that causes physical injury to the plaintiff; (3) that in turn causes the emotional distress. *Id.* "However, now, the impact need not cause a physical injury to the plaintiff and the emotional trauma suffered by the plaintiff need not result from a physical injury caused by the impact." *Powderteck, Inc. v. Joganic*, 776 N.E.2d 1251, 1263 (Ind. Ct. App. 2002).

It is clear from the facts here that Sandoval, in being terminated, did not sustain the direct "physical" impact required to maintain an action for negligent infliction of emotional distress under the modified impact rule. Even when construing all inferences in favor of Sandoval, Franciscan's decision to terminate her was in accordance with its policy which it applied neutrally to all its insurance billers, and it provided Sandoval with substantially more time to correct her deficiency than required by the policy. Franciscan's ultimate decision to terminate Sandoval after providing her with ample time to remedy her KPI did not constitute either an intentional or negligent infliction of emotional distress.

As a result, Franciscan is entitled to summary judgment as to Sandoval's claims under Indiana law.

### *Conclusion*

Based on the foregoing reasons, Franciscan's Motion for Summary Judgment [DE 24] is **GRANTED.** This matter is **DISMISSED**.

ENTERED this 29th day of January, 2024.

/s/ Andrew P. Rodovich
United States Magistrate Judge

16